May it please the Court, Kurt Hermanson on behalf of Ronald Wayne Taylor. I'd like to answer Judge Rawlinson's question about footnote 11. So, Jones does say in footnote 11 that the Supreme Court says that they are not addressing release procedures. That proves beyond a reasonable doubt that both the district court here and California in general, California opinions, gets Jones completely wrong. They cite Jones for the proposition that, well, in Jones they address the issue of release procedures and therefore limited Addington. Jones explicitly says that they're leaving, they're not addressing release procedures in the NGI context. So what we have here, the clearly established United States Supreme Court law is Addington. And your case rises and falls with whether or not Addington is clearly established law for this, for this case. On the due process issue, Addington is the clearly established law. And Addington says, and our argument is that it's unreasonable to limit Addington to initial commitment procedures, which is what the State courts do by citing Jones. So they're citing Jones for implicitly deciding something that Jones explicitly in footnote 11 does not decide. So if we accept your proposition that Addington is the clearly established law in this case, what part of Addington says that in a continued confinement case it is unconstitutional to place the burden of a proof on the Petitioner? Addington says, we conclude that the individual's interest in the outcome of a commitment proceeding. So Addington doesn't say an initial commitment proceeding. It says a commitment proceeding is of such weight and gravity that due process requires the State to justify confinement by proof more substantial than a mere preponderance of evidence, and that's Addington at page 427. But we have to look, we can't just look at the language of Addington. We also have to look at the procedure and what the case involved, don't we? We just can't pluck out language in a case without looking at the entire case to see not only what the Supreme Court ruled, but what the rationale was, right? Yes. Addington was dealing with initial commitment proceedings, but Addington did not limit its holding to that. So the question is, are the — is the State court's determination unreasonable when the State court limits Addington only to initial commitment proceedings when Addington didn't do that? And their citation for limiting Addington is Jones. And Jones explicitly doesn't do that. If I may, I'd like to talk about equal protection. Well, before we leave that point, a counterargument could be made that you're seeking to extend Addington beyond the specific factual scenario that was presented in Addington. And that — I understand that argument. But as prior counsel said, there's another way of proceeding under AEDPA, and that is, is the State court's application of Addington unreasonable? If there's — The point is, as you get down to one word, you read A to mean any, correct? Correct. And the State reads A to mean the initial. Right. And if the Supreme Court wanted to say initial, they would have limited it to initial. So the question is, is it reasonable to limit it that way? Well, under AEDPA, you know, we would have to be convinced that no reasonable judge could read it the way the State read it in order to give you relief. Well, and my argument is, it's unreasonable to apply Addington only to initial commitment proceedings because Addington never made that distinction. So if the Supreme Court had made that distinction, that would be a reasonable way to leave. But the reason it's not reasonable is we're talking about liberty, someone's liberty, someone who has already done their time, and there may be some horrible facts in these cases, but the question is, they've already done their time, and should they be committed for the rest of their life without access to the courts? And when we're looking at something that grave, someone's liberty, the burden needs to be on the State, and the word A shouldn't be read and limited to initial, especially when the Supreme Court in Jones says — I mean, puts that footnote saying, you know, which footnote 11 does show that this is a serious issue, but an issue that in the NGI context they didn't reach that day. But that doesn't help you, in my view. The fact that Jones is out the window doesn't help you unless Addington extends to the circumstance that you're trying to apply it to. Right. And I don't think it extends. I think it encompasses it. By its own words, it — Well, whatever word you use, the fact of the matter is, we would have to decide that Addington specifically addresses this point, and that the California — No, Your Honor. I'm sorry. You wouldn't have to find that. All you would have to find is that what the State courts did was unreasonable in limiting Addington. But, yes. But the problem with your argument is that it would have to be unreasonable for the court to do that. And under AEDPA, it would only be unreasonable if no reasonable jurist could interpret Addington in any other way than you say. Yes, Your Honor. Yes, Your Honor. And I think it's unreasonable to insert the word initial commitment proceedings when the Supreme Court didn't do that. Can I ask just a quick question? Was the commitment proceeding in Addington an initial? Yes, Your Honor. Okay. So under Equal Protection, one thing that I should have put in my reply brief was Jackson v. Indiana. I do cite Jackson v. Indiana and discuss it on page 27 and 30 of my opening brief. The Court should reverse under Equal Protection because the Sexually Violent Predator Act is contrary to Batchelor v. Herald and Jackson v. Indiana. So — So what is it about Jackson v. Indiana, in your view, that proves that there's a violation of equal protection by treating sexually violent predators different than the other categories of mentally ill individuals in California? Sure, Your Honor. And in Jackson, we are talking about release procedures. So in Jackson v. Indiana, AOB 27 and 30, we're talking about release procedures. And there the Court said it's more important than the differences in initial commitment procedures. The Supreme Court there focused on the more stringent release procedures. And in interpreting Backstrom, the Supreme Court in Jones said Backstrom did not deal with the standard for release, but its rationale is applicable here. And that crosses over into the due process area as well. So in looking at how does the Supreme Court read its own jurisprudence in this area, the Supreme Court reads it in Jackson v. Indiana as applying to both initial and subsequent — and later commemorative proceedings. The counsel more fundamentally for an equal protection argument to succeed, you have to show that the various parties were similarly situated. Yes. And the law is — I mean, we have California law on that, and the California courts have said, yes, they are similarly situated to other civil committees. This Court — But we're looking at — for an equal protection claim, we're looking at Federal law. Right. And this — under the Equal Protection Clause, the California courts have been interpreted that way, even though they have a broader interpretation of equal protection that's, in some respects, more protective. But the question here is, I think, is a SVP or a potential SVP similarly situated? No, it's not a potential SVP. It's somebody who's already been adjudicated an SVP. Under the statute we're talking about, this person has been adjudicated an SVP. Well — And now is seeking to be released following that initial commitment. No. The question is, if someone's in custody, then they can become an SVP. If the person is not in custody, then the State must proceed under the LPS Act. So that's the distinction, really, is that — so they're similarly situated people who meet all the requirements of SVP, but — An SVP is a person who's been determined to meet all of the criteria for an SVP. Otherwise, they wouldn't be called an SVP. But what we're — Right? What we're attacking here, though, is the fact that only if the petition is filed while they're in custody can they go and become an SVP. If someone is out of custody, then they cannot become an SVP, and the State must proceed under the LPS Act. And that's what the Supreme — Has someone been convicted of a sexually violent crime in order to even be considered as an SVP? Yes. And so those would be similarly situated people. If someone's out of custody — They're already convicted, but out of custody? Is that what you're saying? Yeah. If someone's done their time and they're out of custody, the State cannot proceed under SVP and hold them for, you know, indeterminately. If they're in custody, it's a completely different standard. And the Supreme Court has said in Backstrom that that is irrational. So under AEDPA, we win because the Supreme Court has said that what California is doing is irrational. And if I may preserve the rest of my time. All right. Thank you. One more question. Addington and Jackson v. Indiana predate our decision in Hubbard v. Knapp? Yes, Your Honor. And did the Supreme Court grant cert in Hubbard v. Knapp? I don't believe so. Okay. Thank you. But I'm signing Jackson for equal protection. But you said it bled over into the due process. Yeah. The reason it bleeds over is because there the Supreme Court is talking about the harm to the individual is just as great if the State, without reasonable justification, can apply standards, making his commitment a permanent one, standards generally applicable to all others. So they're talking about liberty, and they hold that it's a due process. But you actually cited for both equal protection and due process. You can't have it both ways. Well, I'm citing it for the way the Supreme Court's jurisprudence looks at this liberty interest that we're talking about. Thank you. Good morning. May it please the Court. I'm Kevin Viena, California Deputy Attorney General for Respondent and Rappellee in this matter. Since the previous case examined due process, and it appears to me that the Court's argument are similar to the arguments we've made, I would proceed to the equal protection question in this case, which differs from the preceding case, if that's all right. That's fine. First, as the Court made quite clear in questioning about due process, I would remind that this is an AEDPA case, and as the Court indicated, that's a high standard for a Petitioner to meet in Federal court. In this case, the California Court of Appeal found that, or stated that, SVPs are not similarly situated with LPS, or LPS is the general civil commitment standard. That resolves, if this Court agrees, that resolves the equal protection issue completely. And I think the Court must agree, because there is certainly no United States Supreme Court precedent that says SVPs are similarly situated with general civil commitments of people who are not in prison. Didn't the California Supreme Court in the McKee case hold otherwise? In McKee, they certainly said that MDOs and NGIs are similarly situated. I think they did not say that LPS committees are similarly situated, or certainly didn't say that they're similarly situated for purposes of release. I think that the better California case on that question is the one that I referred to in our briefing, In re Smith. And in re Smith, the Court spent a great deal of time demonstrating the difference between LPS committees, who are committed because they are gravely disabled, and SVP committees who are committed not because they're gravely disabled, but because a mental abnormality that is in kind different from other mental illnesses and illnesses that generally apply in LPS, but because their paraphilia or pedophilia so strongly predisposes them for recidivism of very serious crimes. And their treatment, their treatment scheme must be different. That is, their treatment scheme doesn't rely on medication in general. It requires on therapy to try to help those people see the nature of their problem and avoid it. Well, let's say that in the McKee case, the Court did find that these three categories are persons who are similarly situated. What's the impact of that on this Court? Well, if they're similarly situated, then the next step is to see whether the State's different treatment. You're not understanding my question. What is the impact of the California Supreme Court so deciding on the Ninth Circuit making a determination? The — well, some Ninth Circuit cases have said that — have suggested that if a State Court finds a constitutional violation, that the Ninth Circuit is bound by that determination of the State Court in analysis of an AEDBA case. I don't think that's the case here, though, because it is quite clear that California's equal protection, and in McKee it specifically said they were applying California equal protection law, is different and broader than the equal protection claims that arise under the United States Constitution. And the reason you can tell that it's different is because the California Supreme Court proceeds to apply its version of a strict scrutiny test when no Federal court has ever required strict scrutiny for a civil commitment or civil continuation. And, in fact, we think that the better view of Federal case law, although it's unresolved, the better view is that it's a rational basis test that applies. Counsel, what's your response to opposing counsel's observation that the only difference between an SVP committee and LPS-designated individual is the fact that one is in custody and the other is not? That's obviously incorrect. LPS, they are different categories. LPS is the general civil commitment statute for California that deals for all people who are found to be gravely disabled, gravely disabled, unable to care for themselves and a danger to others. SVPs is a very narrowly drawn category. In fact, it's my understanding that of the population of California, approximately 850 currently are classified as SVPs or are being processed for SVP status. In your mind, are those two categories mutually exclusive? My opponent has suggested that it is possible for someone to escape the application of the SVP law and be released. While I would say that that is a conceptual possibility, that is the state made a mistake in failing to recognize that someone qualified for treatment as an SVP during the course of that person or before that person's release and that after release that person could not be processed under the SVP scheme, I think it is unlikely in the extreme that anyone who has been released and is processed under the LPS scheme would be found to be worthy of involuntary civil commitment. And the reason for that is the nature of the mental impairments are greatly different, as explained at great length, I think, in McKee 2. The nature of the impairment is greatly different. SVPs are not gravely disabled. In fact, part of their danger is that they are quite capable of long-term planning and grooming of their subjects, for example. SVPs are not amenable to treatment through medication, but instead through a long-term process of therapy. So while it is conceivable that in an error, an administrative error, someone who is treated as an SVP or as a person, it is unlikely in the extreme, based on the different mental illnesses involved, that they would qualify for treatment under LPS. The second thing is even if they were, even if those two populations or those two categorizations were similarly situated, as McKee explains in great detail as well, there is a compelling state interest in treating them different. And that compelling state interest derives from, first of all, the nature of the crimes, the nature of the treatment, and the harm that are caused to the victims. One other point, could there be an isolated person who might escape SVP treatment and wind up in the LPS system? Although it's possible that it might be, as the United States Supreme Court has indicated in Plywood v. Doe, which is cited in my brief, equal protection treatment doesn't require mathematical precision, and the state may accommodate practical differences in the treatment of folks, and the practical difference that's accommodated here is that people who are in prison for sexually violent crimes or who have committed sexually violent crimes can be more easily detected, observed, and the process can begin for them. That's much more different if you have to find those people among the entire population of 30 million people in California, in particular where they have not committed another crime since their release. My final comment is this. Mr. Hermanson says that this, that what happened in the state of Baxtrom, or Baxtrom in Nevada v. Jackson, I believe that's incorrect. And the reason it's incorrect is that in Baxtrom, the only difference, the only difference between two populations that was identified in the state scheme was some were imprisoned and some were not. In California, that type of arbitrary distinction is, does not occur. And, in fact, our jurisprudence in California is aware of Baxtrom, and Baxtrom is regularly discussed in these cases. The distinction is that confinement is not the only difference. There are a number of differences, and the mere fact that confinement might be different does not mean that when looked at in total, the differences between the two different categorizations, it is not irrational for California to treat people differently based on different circumstances. Indeed, in California, there are nine separate schemes for involuntary civil commitment of one form or another. According to Mr. Hermanson's argument, every one of those schemes would have to collapse. And the only scheme that could exist is the LPS scheme, because that one is the one that applies to general civil commitment. But certainly that's not the case in equal protection law in California or anywhere else in the nation. If the Court has no other questions, those are the points I hope to make. It appears not. Thank you, counsel. Thank you. Rabeau. Thank you, Your Honor. First, I would like to address Judge Hawkins' citation of Hubbard v. Knapp. Your Honor, Hubbard v. Knapp is not applicable here. It's a pre-Proposition 83 case. It's from 2004. So it doesn't deal with what we're talking about here, because the law was changed in 2006. So Hubbard v. Knapp doesn't apply to the law that we're addressing here. Regarding Smith, which counsel relied on, In re. Smith. In re. Smith is wrong. It's contrary to Backstrom. The California Supreme Court in In re. Smith said, a distinction between those who are and are not in prison custody in general passes muster under the equal protection clause. That is contrary to Backstrom. Backstrom says the exact opposite, that it's irrational to consider that. So although the United States Supreme Court has said it's irrational to consider whether someone's in custody, because someone who's out of custody could have a horrible criminal history and have a propensity for crime and be a recidivist. So that distinction is irrational according to our United States Supreme Court. So in this ---- So, counsel, are you asking us to apply a Federal concept of equal protection as opposed to a State concept of equal protection? Yes, Your Honor. So if the State says that those cases, that those classes of individuals are similarly situated for the purpose of equal protection, then we are not to rely on that if we are to look at Federal equal protection law. Is that correct? Well, we have to look at how the State treats those people and which commitment scheme they fall under. And so counsel is incorrect when he says that. But if it's not under SBP, it's LPS. But if it's done in the context of an equal protection analysis under State law, according to what you just said, then the Federal law trumps that. Right? We're looking at Federal equal protection, but we have to look at which scheme they fall under so we know whether or not they're treated similarly. So I cite the Court to page 5 of my reply brief. California law makes LPS commitments the alternative for potential SVPs who are not held in lawful custody. For instance, in 2008, in People v. Superior Court Small this is page 5 of my reply, the State appellate court reversed an SVP commitment where the civilly committed person was not in lawful custody when the State filed its SVP petition. This is not a hypothetical. This is reality. The State appellate court gave the State a choice. Release Mr. Small because you didn't file the petition while he was in custody, or initiate LPS proceedings. So they are similarly situated because that's how the State treats them, one scheme or the other. So that's People v. Superior Court Small. And then I'd like to close on the burden here. The burden isn't irrationality. Under Craig v. Boren's heightened rational basis review, a classification must be substantially related to the achievement of important governmental objectives, Craig v. Boren. So if the ‑‑ if we're looking at whether someone's in custody or out of custody, the exact same type of person, the same dangerous, sexually violent person, it's irrational to treat those people differently. And that's Craig v. Boren. Ginsburg-Rose, Jr. It's a response to opposing counsel's observation that they're not the same in terms of their mental makeup, that the LPS individuals are people who are incapable of taking care of themselves, as opposed to the SVP who are predators in the sense that it's not a lack of mental acuity that is their problem. It's the fact that they use their mental acuity to prey upon people. What's your response to that? The LPS Act is a very broad scheme, and it incorporates a lot of different people. And superior court versus small is ‑‑ people versus superior court, small was the person, proves beyond a reasonable doubt that LPS is the fallback for SVPs. If someone's not in custody, the California court of appeal has said they must ‑‑ they do fall under LPS. So respectfully, what Mr. Viena said is contrary to California law. All right. Thank you, counsel. Thank you to both health counsel. This case is submitted for decision by the Court, and we will stand at recess for 10 minutes.
judges: Lynn, Hawkins, Rawlinson